*Northcountry Federal Credit Union v. Anderson*, 165-3-16 Wncv (Teachout, J., June 22, 2017).
[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

**SUPERIOR COURT**                                          **CIVIL DIVISION**
**Washington Unit**                                          **Docket # 165-3-16 Wncv**

**NORTHCOUNTRY FEDERAL CREDIT UNION,**
    **Plaintiff**


    **v.**


**JOHN N. ANDERSON,**
    **Defendant**

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff's claim is for a deficiency on a vehicle loan and costs following sale of the collateral as well as attorneys' fees for this collection action. Defendant defends on the grounds that the sale of the vehicle was not commercially reasonable, and that Plaintiff is not entitled to attorney fees.

A final hearing was held on February 14, 2017. Plaintiff was represented by Attorney Cynthia R. Amrhein, and Defendant John N. Anderson represented himself. The parties submitted post-hearing memoranda.

### Findings of Fact

Based on the credible evidence, the court makes the following findings of fact:

Mr. Anderson had been a member of NorthCountry Federal Credit Union (NFCU) for some time prior to April of 2015, and had had various accounts and loans there. He had a personal relationship with Bob Cowie, a Vice President of NFCU. On April 24, 2015, he was shopping for a new vehicle. He used the NFCU online loan application process to apply for a vehicle loan. His first application was denied, so he looked for a less expensive vehicle. A loan for $15,825 was approved online. He then proceeded to the Berlin branch of NFCU to continue the loan process.

When he arrived, he met with an employee named Ashley. Loan documents at NFCU are computer documents. Ashley sat at a desk and pulled up a document on a computer screen in front of her. She tilted the screen a little toward Mr. Anderson, but he did not have a full view of the screen. As they talked, she alone looked at the computer screen and summarized aloud the basic terms of the loan: $15,825 at an interest rate of 8.24% with monthly payments of $347.78 over 5 years. He agreed to those terms, and agreed that NFCU would have a lien on the vehicle as security. There is no evidence that Ashley turned the screen toward him to give him the opportunity to see or read the document which, it turned out later when it was printed, covered most of 4 pages. Once he had agreed to the basic terms just stated, she asked him to sign his name on a separate

electronic signature pad sitting on the desk, which he did.  She then provided him with a check to take to the vehicle dealership and a 4-page printout of the computer loan document.  He took it and left for the dealership to pay for and pick up the vehicle.

The printout was admitted into evidence as Exhibit 2.  The credible evidence is that the only portion Ashley read to him consisted of the particularized terms on what later became the first page of the printout (amount, rate, payment amount, etc.).  At one location on the first page as printed out is the following sentence:

> "See your contract documents for any additional information about nonpayment, default, and any required repayment in full before the scheduled date."

This reference suggests that the borrower has the chance to at least look over the document to read it or decide whether or not to read specific terms carefully, and also suggests that there are separate "contract documents."

Below this is a section marked "Signatures."  It states:

> By signing as Borrower, you agree to the terms of the Loan Agreement.  If property is described in the "Security" section of the Truth in Lending Disclosure, you also agree to the terms of the Security Agreement.  If you sign as "Owner of Property" you agree only to the terms of the Security Agreement.  CAUTION:  IT IS IMPORTANT THAT YOU THOROUGHLY READ THE AGREEMENT BEFORE YOU SIGN IT.

This is above the place where a borrower would sign if a borrower signed on paper, but Mr. Anderson was not shown the document on the computer, and he was not asked to, and did not, sign on a paper copy of the document.  He signed on a separate electronic signature pad once he had verbally agreed to the terms Ashley summarized.

The credible testimony about this event is from Mr. Anderson himself.  At trial two witnesses testified for NFCU.  The first was a collections supervisor, who had had no involvement in Mr. Anderson's loan.  She testified about the procedures that credit union personnel are taught to follow when handling vehicle loans.  She testified that staff are taught to "go over" with the borrower the terms that are on the loan documents.  She was not specific about what terms are brought to a borrower's attention as a matter of training before the borrower is asked to sign.  She did not testify that it was standard procedure to show the borrower the computer screen and scroll down through the whole document on the computer before asking a borrower to sign it.  She had no personal knowledge about what occurred on April 24, 2015 with Mr. Anderson.

The credible testimony is that Mr. Anderson was not shown the complete content of the computer document before he was asked to sign the electronic pad, or even shown how much of it there was, and that he was not shown the first portion that includes the warnings quoted above.

2

Mr. Anderson fell behind on his payments. This had happened to him before on prior loans with NFCU and he had previously been allowed to catch up and continue the loan. This time NFCU sent him a letter telling him that he needed to pay $728.90 to reinstate the loan. He was prepared to make a payment that would make up the arrears on the vehicle loan, but the computer-generated letter that he was sent was NFCU's "cross collateralization repo letter," which stated that in order to reinstate the loan, he was required to pay an amount that was not only the unpaid amount on the vehicle loan but also included an unpaid amount on a separate personal loan referenced in the heading of the letter. There was no evidence that Mr. Anderson was aware of a cross collateralization agreement in the computer document or that he had agreed to it.

NFCU contacted Majestic, a repossession contractor, to pursue repossession of the vehicle. Majestic telephoned Mr. Anderson in February to ask if he would turn over the vehicle voluntarily. He responded that he was in the process of trying to negotiate directly with NFCU to make a private sale. Majestic never contacted him again.

On March 3, 2016, Mr. Anderson was served with the summons and complaint in this case. He filed an Answer on March 16, 2016.[1] On March 31, 2016, Plaintiff filed a Motion for Order and Writ of Replevin. Attached to the motion was (1) an affidavit of Robert Cowie stating that the value of the vehicle was $11,550, (2) a bond for $23,100 or twice that amount, and (3) a price report showing that the rough trade-in value was $6,425, the average trade-in value was $7,675, the clean trade-in value was $8,700, and the clean retail value was $11,500.

Mr. Anderson had been trying to sell the vehicle and pay off as much of the loan as he could. He advertised it for sale on Craig's List and eBay for $14,000. He had 4–5 responses, some from different parts of the state. He knew he could not sell the vehicle without agreement from NFCU that it would release its lien upon payment of an agreed upon sale price. He did not want to require an interested buyer to travel a significant distance to look at the vehicle without knowing if he would be able to have NFCU's agreement to complete such a sale. On April 2, 2016, he emailed Mr. Cowie as follows: "I think I am going to have the Charger sold for $14,000 hopefully the bank will take that in lou of repossion and being lucky to get $5,000 for it. Your NADA valuation you submitted to lower the bond amount is the wrong model." He did not receive any response from Mr. Cowie, although he had had direct communication with him at times in the past concerning resolving accounts.

---

[1] In his initial Answer, Mr. Anderson wrote, "Furthermore, the exhibit marked 'Exhibit 1' has never been viewed by the defendant until I was served with this paperwork. You have to sign this document on an electronic pad, while sitting at a loan officer's desk on a screen that is facing the other way. So I signed the agreement without having anything more explained to me than the amount of the monthly amount I would be paying." The fact that he wrote this in his initial response supports the credibility of his trial testimony and was sufficient to raise the defense of lack of enforceable contract.

Mr. Anderson talked on the telephone with Plaintiff's attorney. He offered to pay $1,400 to reinstate the loan, but was told that he would need to pay $3,200, which included not just the amount due on the vehicle loan but an amount due on an unsecured loan. She also told him that he was not allowed to contact anyone at NFCU or she would call the police. He never received any communication from anyone at NFCU or its attorney about his proposal to sell the vehicle at private sale to a person who had responded to his ad to sell for $14,000.

On April 4th, 2016, the court scheduled a hearing on the Motion for Replevin for April 28, 2016. On April 11th, Mr. Anderson filed an Objection to the Motion and requested oral argument.

On April 15th, Majestic repossessed the vehicle in the nighttime by removing it from his home without any further prior contact with Mr. Anderson. Majestic removed it without obtaining a key. No one from Majestic or NFCU or the lawyer's office ever contacted Mr. Anderson to request the key, either before or after the repossession.

On April 18th, NFCU sent Mr. Anderson a computer-generated letter stating that he had the right to redeem the collateral by paying $18,045.93, or the vehicle would be sold at public auction on May 7, 2016.

On April 20th, Plaintiff's lawyer filed a motion to cancel the April 28th hearing on its motion for replevin, as the vehicle had been repossessed and was in NFCU's possession.

On April 22nd, Mr. Anderson filed a motion to dismiss. On April 25th, the motion to cancel the replevin hearing was granted and the motion to dismiss was denied.

On April 26th, Mr. Anderson filed a motion to stay the sale of collateral. It was not ruled upon prior to the sale, and the vehicle was sold at auction for $3,000. The motion for a stay was subsequently denied on May 13th.

On June 8th, NFCU sent Mr. Anderson a letter giving notice of the outcome of the sale and setting forth a claim for the remaining balance plus various costs totaling $14,528.42. This amount included principal of $17,559.66 (which was higher than the original loan amount) plus interest, late fees, repossession fees, and selling fees, less credit for the $3,000 sale price and a "CPI refund" amount. Plaintiff's evidence at trial about the reason the principal was higher than the loan amount was that there was an additional charge for insurance because Mr. Anderson had not maintained insurance, but the evidence did not specify what the loan balance on the loan was or what the additional charge for insurance was.

NFCU's second witness at trial, a collections employee, testified that it was "normal practice" to sell repossessed vehicles through a professional auctioneer. That was NFCU's total evidence regarding the reasonableness of the method of sale, despite the fact that Mr. Anderson had raised the issue as his defense in his Answer.

4

NFCU's witness testified that it is likely that the reason the car sold for a low amount is that there was no key so that the running condition of the vehicle could not be determined. The evidence is undisputed that no one contacted Mr. Anderson at any time, before or after the repossession, to request a key, and that it would have cost $300–500 to have a key made that could have been used to start the vehicle and check its condition.

Plaintiff seeks judgment against Mr. Anderson in the amount of $14,528.42 for the deficiency plus costs and interest and attorneys' fees for collection in the amount of $7,175.00 for a total of $21,703.42.

## Conclusions of Law

*Commercial reasonableness of the sale/ claim for deficiency*

Mr. Anderson's fundamental defense to the suit is that it was unreasonable for NFCU to sell the vehicle at auction in a non-running condition for $3,000 and charge him with a large deficiency when it failed to work with him to obtain perhaps $11,000 and even up to $14,000. This is a claim that NFCU did not sell the vehicle in a commercially reasonable manner.

Basic principles of commercial reasonableness in the Uniform Commercial Code apply. 9A V.S.A. § 9—610(a) of the UCC allows a secured party, after default, to "dispose of any or all of the collateral in its present condition or following any commercially reasonable preparation or processing." The disposition is commercially reasonable if it is made:

> (1) in the usual manner on any recognized market;
> (2) at the price current in any recognized market at the time of the disposition; or
> (3) otherwise in conformity with reasonable commercial practices *among dealers in the type of property that was the subject of the disposition*.

9A V.S.A. § 9—627(b) (emphasis added). Subsections (1) and (2) apply to *recognized markets* only, such as stock exchanges or commodities markets, where procedures are standardized and accuracy of price is assured, and thus do not apply to this case. See 9C Hawkland UCC Series § 9—627:2 [Rev] ("[T]he term 'recognized market' does not refer to a market where goods such as used cars are sold."). The question in this case is the more general one under subsection (3): whether the disposition was commercially reasonable.

"Every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable." 9A V.S.A. § 9—610(b). "[A] low price suggests that a court should scrutinize carefully all aspects of a disposition to ensure that each aspect was commercially reasonable." 9A V.S.A. § 9—610, official comment ¶ 10. "A secured party may not dispose of collateral 'in its then condition'

5

when, taking into account the costs and probable benefits of preparation or processing and the fact that the secured party would be advancing the costs at its risk, it would be commercially unreasonable to dispose of the collateral in that condition." 9A V.S.A. § 9—610, official comment ¶ 4. "To put the standard very generally, the obligation on the secured party to act in a commercially reasonable manner has been said to mean that the secured party should 'use his or her best efforts to see that the highest possible price is received for the collateral.'" 9C Hawkland UCC Series § 9—610:3 [Rev] (footnote omitted); see also *id*. § 9—627:2 [Rev] (explaining that the "practice of dealers" is significant because, ordinarily, "disposing of the collateral in conformity with the practice of dealers should result in a reasonable price inasmuch as those practices are utilized by dealers when they are seeking to *maximize their own benefit* when selling for their own accounts"(emphasis added)).

"The commercial reasonableness of a sale must be determined on a case-by-case basis. The burden is on the secured party 'to prove that the disposition of collateral was commercially reasonable.'" *Will v. Mill Condo. Owners' Ass'n*, 2004 VT 22, ¶ 17, 176 Vt. 380. Failure to dispose of the collateral in a commercially reasonable manner operates as an absolute bar to recovery of a deficiency judgment. *Fed. Fin. Co. v. Papadopoulos*, 168 Vt. 621, 624 (1998); see also *North Country Federal Credit Union v. Carpenter*, No. 392-6-10 Wncv, 2010 WL 8357562 (Vt. Super. Ct. Nov. 23, 2010) (explaining in detail that the "absolute bar" rule should continue to apply under the revised UCC to consumer transactions absent a ruling to the contrary from the Vermont Supreme Court, of which there has been none).

Here, NFCU's evidence is insufficient to support the commercial reasonableness of the sale. Aside from the conclusory statement of the collections officer that it was "normal" practice to sell repossessed vehicles at auction, there is no evidence that selling this vehicle at auction, particularly without having requested or obtained a key to be able to sell it in working condition, was a "reasonable commercial practice" as required by 9A V.S.A. § 9—610(a)(3). On the contrary, the evidence is that Mr. Anderson had communications from interested persons about paying perhaps up to $14,000 and contacted both an officer of NFCU and its attorney about maximizing the return at a private sale. While it is unknown what price might ultimately have been offered after the vehicle was seen, the evidence shows that there was market interest at $14,000, that Mr. Anderson was interested in obtaining the highest possible price for the benefit of NFCU and himself, he was willing to engage in the market and do the legwork to bring this about, and that the fair market value at the time was considered by NFCU to be $11,550. The sale at auction produced only $3,000, a low price in relation to market value.

Mr. Anderson affirmatively reached out to NFCU in a reasonable attempt at producing a willing buyer for everyone's benefit. The circumstances were promising. Car sales on Craig's List and similar websites are far from unusual. NFCU flatly ignored the overture and its counsel threatened to call the police if Mr. Anderson attempted to contact NFCU again. To NFCU's detriment, neither it nor its counsel exhibited any interest in maximizing the sales price. No reasonable automobile dealer would act on its own account in such a self-defeating manner.

6

Setting aside the fact that NFCU did not react to Mr. Anderson's attempts to maximize return through a private sale, and focusing only on the reasonableness of the auction sale that took place, NFCU argues that one reason that the car's value substantially exceeded the low price it attracted at auction was probably that bidders had no ability to determine whether it was in good working order because it was sold without a key. It was NFCU that made no effort to obtain a key from Mr. Anderson or have a key made, which involved a small cost ($300-500) in relation to the reasonable prospect of obtaining an additional $8,000 from the sale ($11,500 – 500 – $3,000 = $8,000).

Considering all the circumstances, the court concludes that NFCU has not met its burden to prove that the vehicle was sold in a commercially reasonable manner. The absolute bar rule applies. NFCU is not entitled to any deficiency.

*Attorneys' Fees*

NFCU seeks $7,175.00 in attorneys' fees. Generally, parties are required "to bear their own costs of litigation unless otherwise provided by contract or statute." *L'Esperance v. Benware*, 2003 VT 43, ¶ 21, 175 Vt. 292, 300, 830 A.2d 675, 682 (2003). There is no statutory basis for fees in this case. NFCU claims a contract right. See the attorney fee provision on the last page of Exhibit 2.[2]

Mr. Anderson acknowledges that he and NFCU made an agreement that he would borrow $15,825 at an 8.24% interest rate with repayment over 5 years at monthly payments of $347.78, and that NFCU would have a lien against the vehicle for the loan. Mr. Anderson accepted those oral terms by signing a keypad and both parties then performed accordingly. He further acknowledges that he defaulted in his payment obligation. He does not agree that he agreed to the additional loan terms that subsequently appeared in the printout document he was handed after he had signed the keypad.

There are three reasons that the court concludes that NFCU is not entitled to attorneys' fees. The simplest is that NFCU as Plaintiff recovered nothing in this action. As to repossession, the repossession took place outside the court process, and in fact NFCU withdrew any request for replevin and asked for the hearing on its motion for replevin to be cancelled when it discovered that Majestic had repossessed the vehicle without court process. As to a money judgment, as determined above, NFCU did not prove reasonableness of its sale and therefore forfeited any claim for a deficiency. As a result, it obtains no relief in this lawsuit. It therefore cannot reasonably attribute any legal expenses to Mr. Anderson.

---

[2] "After we have possession of the Property, we can sell it and . . . . Our expenses for taking possession of and selling the Property will be deducted from the money received from the sale. Those costs may include the cost of storing the Property, preparing it for sale and attorney's fees to the extent permitted under state law. . . ."

The second reason is that there is no enforceable contract term providing for attorneys' fees. "An enforceable contract must demonstrate a meeting of the minds of the parties: an offer by one of them and an acceptance of such offer by the other." *Starr Farm Beach Campowners Ass'n, Inc. v. Boylan*, 174 Vt. 503, 505 (2002). "The time for measuring a 'meeting of the minds' is the point of agreement." *Vaughan v. Tetzlaff*, 141 Vt. 150, 154 (1982). In this case, as a matter of fact, that occurred when the loan officer orally stated the basic terms of the loan and Mr. Anderson agreed and signed the keypad. "Acceptance of an offer is a manifestation of assent to the terms thereof made by the offeree in a manner invited or required by the offer." Restatement (Second) of Contracts § 50(1). The agreement made by the parties did not include the attorneys' fees provisions that NFCF relies upon.

NFCU essentially takes the position that Mr. Anderson is bound by the terms he did not read and that he simply failed to read what he signed and that all the terms of its document are binding nevertheless. In that regard, the court notes that parties typically are bound by the terms of standardized agreements even if they have no idea what those terms are. As the Restatement describes,

> A party who makes regular use of a standardized form of agreement does not ordinarily expect his customers to understand or even to read the standard terms. One of the purposes of standardization is to eliminate bargaining over details of individual transactions, and that purpose would not be served if a substantial number of customers retained counsel and reviewed the standard terms. Employees regularly using a form often have only a limited understanding of its terms and limited authority to vary them. Customers do not in fact ordinarily understand or even read the standard terms. They trust to the good faith of the party using the form and to the tacit representation that like terms are being accepted regularly by others similarly situated. *But they understand that they are assenting to the terms not read or not understood, subject to such limitations as the law may impose.*

Restatement (Second) of Contracts § 211 cmt. b. (emphasis added).

The emphasized portion of the comment points up the deficiency of the evidence in this case. As a matter of fact, here, there was no assent to the terms not read. There was no contemplation that Mr. Anderson's signature on the keypad was accepting the unknown terms that would subsequently be printed from the loan officer's computer, because there is no evidence that Mr. Anderson was ever told that there were additional terms that he would be agreeing to if he signed, nor was he offered the opportunity to look over the entire document to know that he would be waiving an opportunity to read additional terms of a standard form contract.[3] Therefore, those additional written terms

---

[3] It is noteworthy that the language in the attorneys' fees provision NFCU relies on is not expressed in the language of an agreement ("meeting of the minds"), but rather in the

never became a binding part of the parties' agreement. The quoted provisions above from the computer loan document ("By signing as Borrower, you agree to the terms of the Loan Agreement. . . .CAUTION: IT IS IMPORTANT THAT YOU THOROUGHLY READ THE AGREEMENT BEFORE YOU SIGN IT.") only have meaning if a borrower in Mr. Anderson's shoes has an opportunity to see those provisions. If he never saw them, and the evidence is that he did not, he cannot be deemed to have '*assent[ed] to the terms not read or not understood.*'

Finally, even if Mr. Anderson were deemed to be bound by standard form contract terms he did not read, the attorney fees incurred by NFCU are not reasonable in that the evidence does not show that they were necessary. Any such fees were incurred largely because NFCU and its lawyer unreasonably refused to communicate with Mr. Anderson, who attempted to minimize both parties' losses. Inherent in every contract in Vermont is a covenant of good faith and fair dealing.[4] See *Carmichael v. Adirondack Bottled Gas Corp. of Vermont*, 161 Vt. 200, 208–09 (1993) ("The implied promise by its nature protects against 'a variety of types of conduct characterized as involving "bad faith" because they violate community standards of decency, fairness or reasonableness.'" (citation omitted)). Here, Mr. Anderson reasonably sought to promote the interests of both parties to the contract by attempting to maximize the amount of money that could be obtained from a sale once he had defaulted. NFCU and its attorney unreasonably thwarted his efforts—and undermined NFCU's own interests as well—in violation of the covenant. In these circumstances, shifting NFCU's legal expenses to Mr. Anderson could not be reasonable.

NFCU asserts that "[o]ur whole system of commerce would collapse if we were to allow people to escape their obligations because they did not take the time [to] read or inquire before signing a contract." The implication is that if NFCU is unable to recover the deficiency and its fees in this case, then Mr. Anderson is getting away with something. That suggestion, however, ignores the facts as found by the court and, more fundamentally, disregards the deep principle of the law of contracts: that parties to a bilateral contract have obligations *to each other*. That is not how NFCU (and its counsel) conducted itself in this case. Moreover, NFCU can protect itself by making sure that borrowers see and have the opportunity to read the entirety of loan documents.

language of a unilateral declaration: "After we have possession of the Property, we can sell it and . . . . Our expenses for taking possession of and selling the Property will be deducted from the money received from the sale. Those costs may include the cost of storing the Property, preparing it for sale and attorney's fees to the extent permitted under state law. . . ." It is arguable that since Vermont law only allows attorneys' fees based on contract, and this declaratory statement does not express a contract, there is no enforceable right to attorneys' fees at all. However, that is not the basis of this decision.

[4] Mr. Anderson's Answer, while it did not use the legal language of "violation of covenant of good faith and fair dealing," clearly defended against a claim for attorney's fees in Paragraph 26C of the Complaint by stating that such costs "are unreasonable and unnecessary," and he provided specific facts relating to such a defense.

For the foregoing reasons, NFCU has not proved its claim, and judgment will be entered for the Defendant.

Dated at Montpelier, Vermont this __ day of June 2017.

_____
Mary Miles Teachout
Superior Judge